Mr. Cohen, welcome back to the court. Thank you, Your Honor. May it please the court, the judgment should be reversed because the trial judge did not determine lost profits with reasonable certainty. The basic approach of the court was to select certain numbers from the period 1989 and extend those numbers out ten years, subject those numbers to some mathematical calculation, and then conclude that those calculations yielded lost profits. Isn't that always going to be the methodology when this sort of event occurs? You're going to always have to assume what would have happened had there not been an infringement. Well, that may be true, Your Honor, but the principal difficulty in this case lies in the numbers selected by the court. For example, in the actual portfolio, the plaintiff had engaged in risk-controlled arbitrage for about 14 to 16 months. Very successfully. Well, successfully. But in 1989, the Smith Breeden consultant made a projection that in 1990, the plaintiff would earn 98 basis points as an interest spread. We don't know whether that projection ever came true because the plaintiff discontinued risk-controlled arbitrage in the middle of 1990. So notwithstanding the fact that we don't know whether that projection came true. Wouldn't that have been higher in future years? I mean, it was based on accounting in the 1990s. Wouldn't it have been higher? Didn't the government actually benefit from the 98-point spread? There's no way to know, Your Honor, because it was a projection for one year, 1990. But the court said what I just said. The court said, you know, given the trend in interest rates and so forth, the government's probably profiting from this. Well, what I believe the court said was that... And he did a very careful analysis. There's pages on this 98-point spread. Well, Your Honor, if you take the actual analysis itself, what I believe the court did refer to the fact is that the 98 basis points for the projection was a so-called base case. And then the court noted if you increased interest rates, the 98 percent basis points would increase. If you decreased interest rates, 98 basis points might also increase. But that doesn't affect the fact that the 98 basis points was a projection for a single year. That is, the projection said if interest rates in 1990 increase, then the spread might increase. But it doesn't say anything about 10 years. And that's what the trial judge did. It took the 98 basis points and applied it every single year for 10 years. And there's no business in the world that earns 98 basis points or a basis point every single year, notwithstanding changes in the economy, notwithstanding wars, notwithstanding political changes. The difficulty I'm having here is, I think I understand your argument, but as both sides acknowledge, this trial went on for four weeks. And there were witnesses. And I think the judge got this 98 basis point on Mr. Davidson's testimony. And you got to cross-examine him. So it's just difficult for us to sit here at this point, given the standard of review, and deal with your questioning, the validity of him taking this 98 basis points and spreading it over 10 years. Well, Your Honor, this Court has rejected similar efforts with respect to hypothetical costs of replacement. But everything has to be hypothetical. We're in a but-for world. And what would you expect him to do, hold a hearing on each year for a week with cross-examination? And then, of course, you wouldn't have griped about this particular point. It would have been his choice of another number. There's always some level of guesswork, to be blunt, that goes into this. I think that the amount of guesswork in this case is extraordinary. If you compare it, for example, to Confed, where lost profits were awarded after a similarly long trial, and there the thrift had a 20-year history of being in business and a history of being in business after the breach. And the trial judge carefully analyzed the thrift's 20-year history to conclude that the thrift would not have sold certain assets. Here, this thrift went out of business in 1990 after 14 months of risk-controlled arbitrage. Yet the Court holds that it would have earned $33 million in profits in perpetuity based solely upon numbers that have no meaning. For example, in the so-called reinvestment portfolio, there's no basis for saying that this thrift would have beat LIBOR by 25 basis points. There's no evidence in the record that says it would have beat LIBOR by 15 basis points. Why 15 basis points? Why not 25 basis points that Mr. Davidson testified to? The Court simply said, well, 15 basis points. The Court also selected $835 million as the assets. What numbers do you want us to pick? The numbers that should be picked, this is a $9 million case. This company, this thrift, entered into the transaction saying it wished to engage in risk-controlled arbitrage. It was allowed to engage in risk-controlled arbitrage for 14 to 16 months. It then said, we don't want to operate as a regular thrift, so we're going to liquidate the thrift. They didn't liquidate the thrift. They sold the thrift for a $7 million profit. Do you know that? Pardon me? Do you know that? Yes, that's in the record. No, no, no, no. What's in the record is that Globe transfers back to the holding company that much, $7.7 million. But it sold. Those are the assets. Well, in the first place, they sold six out of seven. We don't know what happened to the other thrift. I still don't know what happened to the other thrift. And the $7.7 million is what? It was the distribution left over after they took care of some liabilities. Isn't that correct? Well, yes, but it's a net figure. So what did they sell it for? We don't know that, do we? Well, we do know that the same Smith Breeden estimated the liquidation value of the firm was $7 million, which is what we know. All we know is that that was the part that was returned to Phoenix. But nobody says they retained any more. Mr. Goen, this colloquy proves my or illustrates my point, which is that you've got 15 minutes in front of us. I've spent more than 15 minutes trying to decipher all those numbers in your briefs collectively. The trial court, when heard all of this, heard the witnesses, we can't retry the case up here. We can't recalculate all these numbers. Your arguments are very good. I'm sorry you didn't make it to Congress before they enacted FIREA, and then we wouldn't have had to do any of this. I'm having trouble trying to figure out how to help you. Let me move your focus to a different part of your case, which I thought was actually your strongest point, which is the one that you seem to be arguing, that the trial court suddenly decided to take Davidson's theory and patch it together in some way that nobody had anticipated and come up with a formula for speculating. Judge Rader, unfortunately, is correct. This whole thing, all of these cases make up numbers, and there's nothing we can do about it. I think the lost profits issue, as you know from our earlier discussions and opinions, the whole thing's a nightmare. Somebody's got to make up the numbers. I'm not prepared to make up any new numbers for you. I'm sorry. But what did seem to strike me as a possible problem for you is the argument that somehow the trial judge shifted gears in the last minute without any warning, and you never had a fair chance to go back to the trial judge and say, wait a minute, here's what's wrong with your new shift. Now, the trouble with that argument is didn't you have an opportunity to ask the trial judge for reconsideration, or didn't you file some post-judgment or post-opinion briefing in which you said, wait a minute, you're doing this all wrong. Didn't you get before the trial judge with that argument? We did not quite, Your Honor. The trial judge did ask both sides to perform certain calculations. We did perform those calculations and submit them to the trial judge. The plaintiffs also asked the trial judge to change some of the numbers, and we opposed changing some of the numbers, and we said if the court were inclined to change some of the numbers, that we should be given an opportunity to conduct further discovery. What did the trial judge say to all of that? He rejected the changes and just simply adopted the calculations that he had asked for. Did he address your argument that you never had a fair chance to critique what the trial judge had now done? No, he did not. No, he did not. Let me just shift gears a little bit. It just won one item, which is that $8 million issue about the intangible amortization. As I understood, the only response by the red brief is you waived the right to ask for that, to make that argument. Did you? I mean, you didn't. This was one of the— Was that raised in that sort of post-memo issue? Well, I mean, it was—yes, it is, because in— Yes, it is what? Yes, it was a prejudice that resulted from the way the judge cobbled together the numbers. Mr. Williams had made adjustments for that. When the court rejected Mr. Williams' entire calculation and adopted only part of it, which nobody had urged the court to do, and then by adopting only part of it, the court had increased the damages by $8 million. No, I think I understand at least the argument you're making in that regard. My question is when you have the opportunity, when it was all done and you saw what the judge had come up with, to come back to him either through reconsideration, as Judge Plager pointed out, or in this post-memo, whatever it was, did you raise that with the judge? I don't recall that we did, in part because all of these errors were so difficult to discern to begin with. So is that a problem for you on appeal, to be raising the $8 million intangible amortization issue when you didn't press it when you had an opportunity? I don't believe so. It may have been better practice to raise it, but the judge adopted this new procedure. We're not obliged to file a motion for reconsideration. By adopting this new procedure, which we didn't have an opportunity to consider at the time, we now discover that there were errors. I also want to mention the $13 million. And again, we're not asking the court to invent new numbers. What we're asking the court to do is to disapprove a procedure which just seems to pick numbers out of the air. Well, assuming we don't do that, let me ask you about another number, which Judge Refrater referred to earlier, which is the $7.7 million for the selling of the ad. Is the government asking as an alternative, or in case we reject your more global arguments, are you saying that there at least ought to be an offset for some portion of that $7 million as sort of a double-counting thing? Yes. Well, we don't know what portion is Judge Refrater referred to. It's not necessarily the entire amount. Somebody would have to calculate what portion of that applies, right? Although I would like to point out the inconsistency, the gross inconsistency in the court's award of $13 million while ignoring the $7 million. The court awarded the $13 million on the grounds that that represented the lost profits that Globe suffered from 1999 into perpetuity. Well, the same principle applies to the $7 million, but the court never mentions the $7 million. If you're going to give them $7 million, which is the value of the business, then they're not entitled to lost profits, because the value of the business is in fact the lost profits, just as the court said with respect to the $13 million. The fact of the matter is the plaintiffs, as I said, wanted to engage in risk-controlling arbitrage. They were not allowed to. They liquidated the business. The court awarded them $9 million in incidental expenses that they would not have incurred had they not liquidated the business. We don't contest the $9 million. They were made whole when they voluntarily got out of the risk-control arbitrage business, and we paid them or will pay them the $9 million in incidental expenses that they incurred as a result of the breach. And for those reasons, the judgment should be reversed. Thank you, Mr. Cohen. The court will restore three minutes of rebuttal time for Mr. Cohen, and if you could give Mr. Cain an additional three if he needs to use it. May it please the court. Good morning. If I may address first a comment from Judge Plager with respect to whether or not the rules of the game were changed in the midstream here. There was no surprise that the judge ended up calculating damages in the way the judge did. The government was on notice of that. I would specifically point the court to Judge Leto's summary judgment opinion in this case, and the site would be 59 Fed Claim, page 95. In that document, Judge Leto. Where is it in your record?  On that page, if I may proceed, Judge Leto states, most importantly, the government's position against any lost profits measure of damages is doomed by the extensive portfolio of hedged mortgage-backed securities that Globe held at the time of the breach. That portfolio by itself could constitute a basis for substantial damages measured by lost profits, and he continues. So there's great specificity there, Your Honor, with respect to the court relying on Mr. Davidson's projections. Also, Mr. Davidson's testimony, both in deposition, which has been incorporated into the record, and at trial, makes it clear that if the judge chose to, Mr. Davidson's determinations, findings, expert opinions could be included as part of a lost profits damages model. For example, at page A102474 of the appendix, Mr. Davidson testified at trial that his analysis could be used as, quote, an input to a damages calculation. That is precisely what Judge Leto did. In other words, you're saying that there were two alternative net interest income calculations presented by your side at the trial? Yes, Your Honor. Mr. Williams presented one, and Mr. Davidson presented one, and that, frankly, plaintiffs pressed Mr. Williams' calculations because they would have provided significantly higher damages. But there's equally inconsistent testimony on the other side of what Mr. Davidson was supposedly doing. For example, your opening remarks, I hope the court will accept Mr. Davidson's testimony as support for a small but important part of Mr. Williams' testimony, that because, after all, Mr. Williams has continued in this business, et cetera, one could have read that plus the Davidson statement, I've been retained by counsel for Globe, et cetera, to review Globe's investment strategy and to determine whether that strategy would have remained viable throughout the 1990s. You could read those statements much more narrowly. Your Honor, with all respect to my colleague who made that statement, it was a statement in opening statements. It wasn't the testimony of any witness. It wasn't a question or an answer on either examination or processing. So you're telling me we shouldn't believe anything you tell us? No, Your Honor. But I don't think too much weight should be given to that statement. I don't think that statement undercuts what Judge Leto said in his summary judgment order. I don't think that statement undercuts what Mr. Davidson said at trial. Now, and also as a matter of preparation, Mr. Davidson on deposition, and this deposition statement is included in the record. I don't believe it's in the appendix, but it's at page 411 of the appendix of defendant's motion for summary judgment filed on April 10, 2003. Mr. Davidson said the following on deposition. And he said that his analysis, quote, was not necessarily a damage calculation. It is a component of a damage calculation, or it could be fed into a damage calculation, but by itself it was not intended to be a complete damage calculation. And then he continued, this is a component to the damage analysis or of a potential damages analysis, but this is in and of itself not a damage calculation. Again, that statement was made a year and a half before trial. I don't believe my colleague Mr. Cohen can fairly claim surprise, prejudice, any damage as a result of that. Everyone realized that the court may well use Mr. Davidson's calculations as an element of an overall damages claim. Mr. Cain, can we move to the post-1999 calculation? Yes, Your Honor. There the trial court is trying to determine the residual value of the thrifts that Globe would have owned. But Globe had already sold those in 1990 and received at least $7.7 million for them. Why isn't it double calculation to allow the government to set the price of those entities in 1990 and then to calculate again what Globe should receive for them in 1999? Yes, Your Honor. As a minimal matter, you have to back some portion of the $7.7 million out of the $13 million residual value, don't you? Because that was what was actually determined by the market to be their worth in 1990. I don't believe so, Your Honor. The $7.7 million was a liquidation value. What it represented, Your Honor, it represented perhaps $4 million of earnings that occurred prior to the institution going out of business. It represented the return. Fine. That's part of the sales value of the institution. You haven't changed anything. It represented the return of the initial capital investment. Fine. That's part of the sales value. That will be included. You haven't changed anything. It was not at all calculated in or included as part of the damages model that the judge adopted. Certainly, the damages model, he is trying to decide the residual value of the thrifts that would have been owned. How can you ignore the fact that they already received $7.7 million at least for those? Your Honor, the branches that How come that doesn't at least get backed out? Because, Your Honor, we believe what that $7.7 million represents is profits, the return of profits that were earned through the hard work of the plaintiff, not from any benefit. Sure, that's always what that's. In other words, that's the value that is in the thrift and part of the sales price. Yes. You're not making any headway on telling me why it shouldn't be backed out of the residual value of the thrifts. Your Honor, I believe you're referring to the branch. You mentioned thrifts. Are you referring to the branch sales that occurred? Yes. Okay. There's seven of them. Six of them get sold to First Midwest or something, right? Right, Your Honor. And the institution paid for those branches. They bought those branches, frankly, from the United States in a receivership transaction. And when they bought those branches, they paid a premium of something like 2.6%. When they sold them, they sold them not because that was part of their business strategy. It was essentially a forced sale. That institution had to go out of business. Understood. That's why we're not going to say 7.7 million is the total damages in this case, because, of course, they sold them under duress after the breach had occurred and the breach had affected the value of the entire business. That's why we're not saying that. Otherwise, you'd been stuck with $7 million, period. But the question is, when you're calculating the residual value of those institutions, why don't you include what the market gave for those in 1990 and back that out? Well, Your Honor, first of all, the government made no showing of what the market gave for those. The 7.7 million that the Court is referring to, I believe, as I indicated, Globe to Phoenix. Right. It went to Phoenix, and it reflects the profits the institution made. The institution was successful from day one of going into business. It exceeded plan for every period, every reporting period, after the contract was executed. Okay. If 7.7 isn't the right amount, then maybe we need to go back to the Court and find out what was the value received for the sale of those institutions in 1990 and back that out of the 1999 amount. Right? I don't believe so, Your Honor, because what the judge did here is he made one conservative, as Judge Klager indicated, I don't believe this Court can go back and reevaluate every calculation Judge Leto made. He made a lot of calculations very carefully, very specifically, and there's no indication there was any clear error in any of those calculations. But we're singling out a single problem, which is shouldn't the judge have subtracted from the speculative award for the future the actual value that you all obtained when you sold five of those six branches in 1990? I mean, this is not high math. This is not rocket science. This is just obvious calculation, which we can't find any record of in the judgment that he handed down. And, I mean, we can do that, I suppose. We could do that as a remitter of some kind, perhaps. Or we can send it back and say, Judge, did you miss this little point? It's not so little. Even in the United States government, $7 million ought to count for something. Your Honor, I would submit that Globe could have dividended out, had the breach not occurred, Globe could have dividended out at any time $7.7 million to its shareholder, and that would not have affected in any manner its future profits. But it didn't do that. No, but my point, Your Honor, is— What is the point? My point is—I'm trying to—I'm obviously trying to—I'm not making it well, Your Honor. Let me try again. My point is that the $7.7 million was not a building block necessary for Globe to achieve the lost profits that it would have earned in the real world had the breach not occurred. And the reason for that is simple. For Globe to have continued in business at its size of approximately $735 to $835 million at what would then have been a 5% capital level, Globe would have needed only $41 million in capital. If Globe had dividended out the $7.7 million, it would have had still $51 million. So it could have carried forward with its business and achieved these lost profits without problem. Again, my point is it wasn't a building block. It was the return to the owners of an initial investment. And I believe that is critical, Your Honor, because when you look at what Judge Leto did, time after time, and he's very accurate in saying this, he made conservative, prudent decisions and calculations. And we frankly viewed the award he came out as—he had in mind, Your Honor, as I believe, decision in Glendale and the Court's decision in Glendale and Fifth—Third, in which the Court said lost profits have been difficult. And he looked at why is this case different? And this case is different because there was a specific business plan that was based entirely on the forbearance capital. We had a defined starting date and a defined ending date. It's not a business with all sorts of different lines of business that we had to determine what this—how this capital would be used. Can I ask you, just before your time runs out, can I just move on to the $8 million, the intangible amortization expense number? As I—maybe I missed something in your brief. The only response I saw to that issue was you said the government waived. I would turn Your Honor's attention to the very last sentence of our brief prior to the conclusion on page 67. In any event. Okay. Right. In any event, as a non-cash expense, goodwill amortization is irrelevant to lost cash profits. What the judge did is he subtracted—he looked at the projected expenses. He looked at the projected income. These are all hard numbers. Right. And he did a subtraction. In the real world, these—this goodwill was written off. And we spent a lot of time, frankly, trying to figure out even what the government was trying to say because it's not something that was advanced at trial. It's not—I believe it was something that may have been advanced. I believe Judge Rader asked the question, or maybe Judge Plager, whether it was advanced on rehearing. And I believe it might be incorporated at page 5 of the order for entry of final judgment. There was not a petition for rehearing, but the judge required additional briefing after the initial decision. And I think on page 5, other claims, as I read that today, I believe that indicates that the government did make reference to this claim before Judge Leto at the final stage. And so they did advance it, but there were no findings on it. And it's something, when we think about it, it really doesn't make sense. There was no element of—this was not an issue, again, similar to the types of issue that this court faced in Glendale, where the parties were attempting to achieve lost profits or different types of damages based on intangibles. There was no intangible element to Judge Leto's calculation, Judge Brose. There was just no element. So in addition to this claim being waived, it was a calculation of a non-cash—it was—the goodwill amortization, as we say on page 67, was just totally irrelevant. And you only need to take the goodwill charge once. And as I indicated earlier, and I don't have a record site to give you, but if the court looks at the record, the court will see that we wrote off this goodwill in the real world. This goodwill was written off during the course of business and as part of the final liquidation. There was no need to write off this goodwill again to improperly, we believe, reduce the damages awarded. But also— I'm not sure I'm understanding, but let me—the government's response to your argument is that their view is that the trial court improperly treated Globe's actual intangible amortization expense as though it were a cash expense. Do you disagree that the trial court did that? Yes, Your Honor. We absolutely do disagree. The trial court didn't do that. The trial court's damages calculation does not include goodwill in the manner the government suggests. As I indicated, in the real world, Globe wrote off the goodwill as part of its ongoing business as it was winding down, and it wrote off the rest of it as part of the liquidation. The lost profits calculation that Judge Leto engaged in was simply the cash income, the projected cash income, less the projected cash expense. That was the calculation, Your Honor. So in answer to your question, we don't believe—respectfully don't believe the government is correct. Run that past me one more time, the last note, Your Honor. Run that one past me one more time. As Judge Leto calculated the damages, the lost profit calculation was simply the cash income that was projected from Mr. Davidson's projections, less the cash expenses as projected by Mr. Williams. That was the calculation. It did not have this goodwill element in it that my colleagues on the other side suggest. Thank you, Mr. Keene. Thank you, Your Honor. Mr. Cohen, the court restored three minutes. Thank you, Your Honor. I'll just make a few points. The first point is that I think that these questions have pointed out the need for a remand on the $7 million. I'm confident that the $7 million sale of the assets was not under duress in the sense that the cases which have referred to sales under duress because those cases deal with the loss of goodwill due to the value of goodwill in the traditional sense because of a sale under duress. Here they sold the assets at market value and received market value for them. If that's the only issue on which we happen to, I'm not suggesting it is, but that should be the only issue on which we happen to agree with you. Can't we do that ourselves and just send it rather than remand it? Well, you could, Your Honor, but I think also the question is raised because the trial judge didn't address it was how are they entitled to both the value of the business and the lost profits? The trial judge never addressed that, never addressed the $7 million at all, although he raised it repeatedly. Well, can't we do that? If we conclude that's correct, couldn't we just do that? Yes, you could. Yes, you could. That was my question. Yes. I also want to emphasize the fact that we are not asking the court to, again, we're not asking the court to devise new numbers. What we're saying is that these numbers really have no basis in the record. Mr. Davidson, as we noted on page 18 of our brief, said, I have not performed an analysis of Globe's investment strategy going forward. So his numbers are not based upon an investment strategy. With respect to the Lehman Index, in addition, Mr. Musica's Exhibit 8, which is in the record, showed that Globe never reached the Lehman Index return during the period of its existence. And Mr. Davidson testified that Mr. Musica's mathematics were correct. Well, if that's so, how can the court end up awarding not only the Lehman Index as a return, but a Lehman Index plus 25 basis points? The fact of the matter is that all of the numbers were not supported by the record. And quite unlike a case such as Comfed, Commercial Federal, which I admit is a court of federal claims case awarding lost profits, but it was affirmed by this court. There's no evidence in the record, even like there was in Glendale. And so in conclusion, the court should reverse the judgment except for the $9 million and award them, allow them to recover their incidental expenses in liquidating the business that they wouldn't have incurred in the absence of the breach. Thank you. All rise.